IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Raymond P. Moore

Civil Action No. 1:22-cv-01575-RM-SKC

ERIC COOMER, Ph.D.,

      Plaintiff,
v.

PATRICK BYRNE,
STEVEN LUCESCU, and
THE AMERICAN PROJECT, INC.

      Defendants.

---

## ORDER

---

This matter is before the Court on Motions by each of the Defendants to dismiss Plaintiff Eric Coomer's complaint. (ECF Nos. 84, 87, 88.) Dr. Coomer's complaint alleges that Defendants Patrick Byrne, Steven Lucescu, and The America Project, Inc. ("TAP" and, together, the "Defendants") committed the torts of defamation, intentional infliction of emotional distress, and civil conspiracy against him, as well as raising a claim for unjust enrichment and asking the Court to impose a permanent injunction. (ECF No. 1.) Each Defendant raises several arguments as to why the case should be dismissed. Dr. Coomer has responded, and the Defendants have each filed a reply and the Motions are now ripe for determination. (ECF Nos. 89, 92, 93, 94.)

I.    **Background**

This case is one of many that arose in the aftermath of the 2020 presidential election, and specifically from allegations regarding the voting services provided by Dominion Voting Systems ("Dominion"). (ECF No. 1, p.1.) The Plaintiff, Dr. Coomer, is the former director of

1

product strategy and security for Dominion.  (Id.)  Defendant Mr. Byrne is a founder and board member of TAP and was credited as a producer of a film about the 2020 election entitled "The Deep Rig" (or "the Film.")  (Id. at pp.1, 5.)  Defendant Mr. Lucescu is also a named producer of the film.  (Id. p. 5.)  Both Mr. Byrne and Mr. Lucescu are also what are commonly referred to as "election deniers."  (Id.pp.26, 29-30, 33, 37.)  Defendant TAP owns the copyright for the Film and has been the recipient of at least a portion of the profits.  (Id.)

"The Deep Rig" is styled as a documentary and purports to expose a number of ways that the 2020 election was fraudulently influenced to ensure the election of President Joseph Biden.  Dr. Coomer alleges that the lynchpin of the Film is an interview with a conservative activist and Colorado resident named Joe Oltmann.  (Id., p.2.)  Mr. Oltmann spoke on film and claimed to have infiltrated a conference call by "Antifa" activists in Colorado prior to the election.  (Id. p.18.)  Mr. Oltmann claimed that during the conference call, someone named "Eric," who was identified by others on the call as "the Dominion guy," reassured the other call participants that they did not need to worry about the possibility of President Donald Trump's reelection because "Trump is not gonna win.  I made f-ing sure of that."  (Id.)  Mr. Oltmann claimed that he then googled "Eric," "Dominion," and "Denver, Colorado" and that was how he discovered Dr. Coomer.  (Id.)  Dr. Coomer states that all of Mr. Oltmann's allegations about him and about Dominion have been debunked and are provably false.  (Id. pp.48-51.)

In the aftermath of the 2020 presidential election, Mr. Oltmann's claims about Dr. Coomer became one of the talking points used by various election deniers, including President Trump's legal team and others.  (Id., pp. 22-23.)  As a result of these public accusations and the wide broadcasting of his name, Dr. Coomer has received numerous, credible death threats and has been forced to take necessary measures to protect himself.  (Id., pp.60-61.)  In addition, Dr.

Coomer has suffered serious damage to his reputation as well as a loss of earning capacity due to his inability to be employed to work on elections and election support. (Id.) Dr. Coomer has sued several of those individuals, including Mr. Oltmann, filing his first suit on December 22, 2020. (Id. p.23; ECF No.2, all.) Despite the filing of his suits, the Defendants produced and released the Film during an event in Phoenix, Arizona on June 26, 2021. (Id. p.36.) Although Mr. Oltmann's claims could have been fact-checked and were demonstrably false, Dr. Coomer notes that the Defendants never contacted him for comment or corroboration. (Id. pp.48, 56-59.) Rather, they relied on Mr. Oltmann as the sole source of evidence on the issue. (Id. p.56.)

A question-and-answer session from that premier was livestreamed nationally, although the Film itself was not. (Id. p.37.) Defendants urged "patriots" to make money by paying $500 to license the Film, to rent out theaters and to earn money by selling tickets to view it. (Id. pp.40-41.) The Defendants also promoted the Film by appearing on conservative radio shows and podcasts, including appearances by Mr. Byrne on Mr. Oltmann's podcast. (Id. pp.54-56.)

On June 24, 2022, Dr. Coomer sued the Defendants in this Court. (Id. p.68.) In his lengthy Complaint, Dr. Coomer raised claims of defamation, intentional infliction of emotional distress, civil conspiracy, and unjust enrichment. (Id. pp.62-66.) He also requested a permanent injunction, which would require the Defendants to remove all of their allegedly defamatory statements upon final adjudication of the case and demanded that the Defendants immediately and publicly retract all the allegedly defamatory statements they had made about him. (Id. p.66.)

Each of the Defendants filed a separate Motion to Dismiss. (ECF Nos. 84, 85, 87, 88.) In those Motions the Defendants all raise similar arguments that they assert require this Court to dismiss Dr. Coomer's case. Specifically, each Defendant moves under Fed. R. Civ. P. 12(b)(2) for dismissal because, they argue, the Court lacks personal jurisdiction over them. (ECF Nos.

85, pp.5-11; 87, pp.4-7; 88, pp.12-19.)  They also each argue that Colorado is not the proper venue for this case, and also argue that dismissal is required under Fed. R. Civ. P. 12(b)(6) because, they say, Dr. Coomer failed to raise a claim upon which relief can be granted—specifically, that, under Colorado law, he was required to plead actual malice in committing defamation because this case involves a matter of public concern.  Dr. Coomer filed an Omnibus Response to the Defendant's Motions to Dismiss (ECF No. 89) and each Defendant has now filed a Reply in support of the Motions (ECF Nos. 92, 93, 94.)  Thus, the Motions are now ripe for decision.

 II.   **Legal Standards**

 A.  **Rule 12(b)(2) Motion**

Fed. R. Civ. P. 12(b)(2) allows a defendant to move to dismiss a complaint for lack of personal jurisdiction.  To establish personal jurisdiction over a nonresident defendant in a diversity action, the plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the Due Process Clause of the Fourteenth Amendment.  *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228 (10th Cir. 2020).  Because Colorado's long-arm statute is coextensive with the Due Process Clause, this amounts to a single inquiry.  *See Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).  The plaintiff bears the burden of establishing personal jurisdiction, but at the motion to dismiss stage, it need only make a prima facie showing that the defendant purposefully established minimum contacts with the forum state.  *Dental Dynamics*, 946 F.3d at 1228-29.  The "minimum contacts" standard is met if the defendant has purposefully directed its activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities. *Intercon, Inc. v. Bell Atl. Internet*

4

*Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000).  The purposeful direction requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or because of the unilateral activity of another party or a third person.  *Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d at 895, 904-05 (10th Cir. 2017).  In this context, purposeful direction has three elements: (1) an intentional action, (2) expressly aimed at the forum state, and (3) with knowledge that the brunt of the injury would be felt in the forum state.  *Dental Dynamics*, 946 F.3d at 1231.  The "'arising out of' prong of the specific jurisdiction test," specifies that "the actions of the defendant giving rise to the litigation must have created a 'substantial connection' with the forum state."  *Archangle Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1194 (Colo. 2005).  Finally, while "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties . . . a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Walden v. Fiore*, 571 U.S. 277, 286 (2014).  That principle applies even when an intentional tort, like defamation, is involved.  *Id.*

In the unique context of the internet, the analysis of personal jurisdiction has been "adapted."  *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011).  Such adaptation has been deemed necessary because "in a sense, the internet operates 'in' every state regardless of where the user is physically located, potentially rendering the territorial limits of personal jurisdiction meaningless."  *Id.*  Thus, courts consider whether the internet user or site has intentionally directed his/her/its activities as the forum state, rather than merely having their materials accessible there.  *Id.*  As the 10th Circuit summarized, there are three key considerations in determining personal jurisdiction in the internet context: (1) maintenance of a web site does not, in and of itself, subject the owner to personal jurisdiction on the basis that

5

users in the forum state can access the site; (2) "posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside)"; and (3) courts should look to "indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.* at 1241.

If the plaintiff makes the required showing, the burden shifts to the defendant to show that exercising personal jurisdiction would offend traditional notions of fair play and substantial justice. *Dental Dynamics*, 946 F.3d at 1229. To make this assessment, courts consider the following factors: (1) the burden on defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies. *Id.* "The weaker a plaintiff's showing with respect to minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Id.* (quotation omitted). Factual disputes are resolved in the plaintiff's favor when determining the sufficiency of its showing. *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

**III. Application**

Personal jurisdiction is determined with respect to each Defendant individually. The Court would therefore usually consider each Defendant in turn. In this case, however, Dr. Coomer does not offer different facts to support his argument that this Court has jurisdiction over each of the Defendants. Because Dr. Coomer treats the Defendants as a group, the Court is able to do so as well. The Court notes, however, that its analysis would be unchanged if it were to

6

tease apart the arguments as to each individual defendant in this case, given the allegations and the evidence presented in affidavits.

Dr. Coomer does not allege that any of the Defendants has engaged in such systemic and continuous activities in Colorado so that the Court has general jurisdiction over them.  *See Giduck v. Niblett*, 408 P.3d 856, 863 (Colo. App. 2014).  Instead, he argues that this Court has specific jurisdiction over each Defendant.  A court has specific jurisdiction if the injuries at issue in the litigation arose out of, and are related to, the defendant's activities that are significant and purposefully directed by the defendant at the forum.  *Id.*  In other words, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum state."  *Walden*, 571 U.S. at 284.  Because Dr. Coomer is arguing for specific jurisdiction in this case, the Court must consider whether the Defendants' activities that led to this suit created a substantial connection with Colorado.

Dr. Coomer makes a number of allegations that, he argues, demonstrate that the Defendants did, in fact, create such a substantial connection with Colorado.  Specifically, he alleges that each of the Defendants:

- Committed tortious acts against a resident of the state of Colorado giving rise to this cause of action (ECF No. 1, pp.6-9);

- Had knowledge and intent that the effects of those actions would be felt in Colorado and that the injury would occur in Colorado (Id.);

- Had knowledge and intent that the defamatory messages would be directed at Colorado (Id.);

- Derived the defamatory statements from Colorado sources, namely Mr. Oltmann (Id.);

7

- Made statements about a Colorado resident about that resident's work and employment for a Colorado company (Id.);

- Included information about events that allegedly took place in Colorado (ECF No. 89, p.23);

- Thereby made Colorado an integral focal point of the defamatory statements (ECF No.1, pp.6-9);

- Purposefully sought a national audience for the Film and intended that it reach every citizen in the United States (Id. pp.6-9, nn. 3, 6, 9);

- Published statements using national platforms and broadcasts that "purposefully direct" their statements into Colorado and to Colorado audiences (Id.);

- Created a distribution platform for the Film, controlling the means and direction of distribution of the Film (ECF No. 89 p.17);

- Intended that the Film reach Colorado audiences (Id.);

- Profited from distribution into Colorado (Id.);

- Had a relationship with Oltmann, who they knew to be a Colorado resident and to have a "sizable Colorado following" and included him in the film (Id.);

- Hired Oltmann to assist with creating the distribution platform for the film (Id.);

- Made appearances on Oltmann's podcast, which he "routinely" records in Colorado, and during those appearances they promoted TAP's work and sought donations (Id. pp.17-18);

- Controlled the sales decisions regarding the Film (Id., p.23);

- Could easily foresee that Colorado internet users would receive the defamatory content (Id.);

- Dr. Coomer saw information about the film in Colorado, and watched the livestream from Phoenix in Colorado (ECF No. 89-1 pp.11, 19); and

- Dr. Coomer viewed the film in Colorado after its release (Id. p.19).

Dr. Coomer also makes a number of allegations about the conduct of Mr. Oltmann, noting that he promoted the Film to his "sizable Colorado audience" and hosted screenings of the Film in Colorado, using the Defendants' platform. (Id. p.24.) He also repeatedly references that the Defendants conducted fundraising in Colorado from Colorado donors and notes that TAP ultimately donated $100,000 to a Colorado-based super PAC to support a candidate for Colorado Secretary of State in the 2022 election. (Id. p.27; ECF No. 89-1, p.14.)

In the Court's view, Dr. Coomer's arguments for specific jurisdiction in this case fall into roughly three categories. First, Dr. Coomer asserts numerous facts in support of the contention that the Defendants defamed a resident of Colorado by using a source, Mr. Oltmann, (who is also a Colorado resident with a podcast he records in Colorado with a sizable Colorado following), who spoke about events that allegedly took place in Colorado, related to a Colorado company. Second, Dr. Coomer makes a number of arguments to the effect that the Defendants deliberately intended that their film reach a Colorado audience, which it did, and that they wished to, and did, profit from that Colorado audience. Third and finally, Dr. Coomer makes a number of allegations that relate to the Defendants' other contacts with the State of Colorado generally. The Court will address those categories in turn.

Regarding the first set of arguments, the Defendants do not dispute Dr. Coomer's well-pled allegation that they made their purportedly defamatory comments about him, a Colorado resident. Nor do they dispute that the Defendants relied on a Colorado source, Mr. Oltmann, for the defamatory "facts" they published in the Film. The Court also agrees that the events at issue

9

related to Dominion, a Colorado company, and some portion of those events presumably took place in Colorado.  Nevertheless, the Court cannot conclude that these facts demonstrate that the Defendants intentionally aimed their conduct at Colorado.  It cannot be disputed that the brunt of the injury in this case, which the Court does not diminish, was suffered acutely by Dr. Coomer in Colorado, and that the Defendants knew that Dr. Coomer would suffer those injuries in this state.  However, something more than foreseeability is required in order to invoke sovereignty over an out-of-state individual.  *Dudnikov*, 514 F.3d at 1077.  Rather, a plaintiff can show that a defendant has committed acts "that 'are performed for the very purpose of having their consequences felt in the forum state'" in order to meet the purposeful direction requirement for specific jurisdiction.  *Id.* at 1078 (quoting *Finley v. River North Records, Inc.*, 148 F.3d 913, 916 (8th Cir. 1998)).  However, Dr. Coomer pleads no facts that suggest that the Defendants' aim was to defame him personally.  Rather, the evidence and factual allegations suggest that they were seeking to make money, and possibly to overturn the results of the 2020 presidential election.

Similarly, the fact that the Defendants used Mr. Oltmann as their sole source for the statements included in the film cannot confer specific jurisdiction in this case.  As the Supreme Court explained in *Walden*, the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  571 U.S. at 285.  That Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  *Id.* at 284.  Thus, no matter how large Mr. Oltmann's following in Colorado may be, that does not confer personal jurisdiction over the Defendants.  In the Court's view, the fact that Mr. Oltmann may record his podcast while he is in Colorado is also insufficient.  Dr. Coomer makes no allegation that any Defendant actually traveled to Colorado in order to

participate in Mr. Oltmann's podcast. Nor does he suggest that Mr. Oltmann's podcast has an audience exclusively, primarily, or even significantly composed of Colorado residents. Again, without more the Court cannot conclude that the Defendants thus manifested an intent to purposefully direct their defamatory content to Colorado, as opposed to nationally.

With regard to the content, the Court considers the entire film to determine if its "general thrust and content" "manifest[s] an intent to target and focus on" Colorado audiences. *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002). In this case, even the portion of the film discussing Dr. Coomer is ultimately not focused on Colorado. Rather, the Defendants were attempting to perpetuate the story that election interference had taken place in certain hotly contested states during the presidential election, including Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. (ECF No. 1, p.42.) The Defendants asserted that in major cities in each of those states, voting was stopped and votes for President Biden were added to their tallies by Dominion.[1] Colorado was not a contested "battleground" state during the election and its relationship to the events in the film, the film's content, is the incidental result of the fact that Dominion is headquartered here.

Dr. Coomer's second set of contentions center on his assertion that the Defendants published their statements using national platforms and broadcasts that purposefully directed their statements at Colorado, that they intended that their film be seen in Colorado and that it reach Colorado audiences, and that it in fact did reach Colorado audiences, resulting in profits for the Defendants. Dr. Coomer's allegations fail to plead facts to demonstrate that the Defendants possessed such a particular intent. Rather, he relies on conclusory statements. For

---

[1] The Court notes that Dr. Coomer has stated, the Defendants do not dispute, and the Court believes, that Dominion had no presence in the cities of Milwaukee or Philadelphia during the 2020 election and that, therefore, the Defendants' contentions regarding at least those two cities cannot be true. That does not alter the Court's analysis.

11

example, with regard to each Defendant Dr. Coomer states that he or it "knowingly published his[/its] statements using national platforms and broadcasts that purposefully direct their statements into the state of Colorado and to Coloradan audiences." (ECF No. 1, pp.7-9, nn. 3,6,9). "[W]hen the court's jurisdiction is contested, the plaintiff has the burden of proving jurisdiction exists. In the preliminary stages of litigation, however, the plaintiff's burden is light." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (citations omitted). "However, only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true." *Id.* Dr. Coomer never states what publications the Defendants utilized or why those particular publications demonstrate a specific desire to project their statements into Colorado. Similarly, while Dr. Coomer states, and the Court believes, that the Defendants wished that their film would reach every citizen in the United States, the same could be said of any publication with a national audience. Here, the Defendants have essentially placed information on the internet and made it accessible to people in every state, hoping to achieve a wide audience for their film. If that, alone, could subject a person "to personal jurisdiction in each State in which the information is accessed, then the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist." *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002).

      The test might be satisfied through allegations that the Film was, in fact, broadcast to a substantial Colorado audience or that a significant number of Colorado residents were exposed to the Defendants' publicity efforts. *See, e.g. Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) (concluding that "regular monthly sales of thousands of magazines cannot by any stretch of the imagination be characterized as random, isolated, or fortuitous,"); *id.* at 780 (concluding

that the defendant produced a national publication aimed at a nationwide audience and that there was "no unfairness in calling it to answer for the contents of that publication *wherever a substantial number of copies are regularly sold and distributed*" (emphasis added)); *Giduck*, 408 P.3d at 865 (noting that, although the plaintiffs contended that the defendants' defamatory statements were sent to "various individuals, customers and potential customers of [the plaintiff's], to [the plaintiff's] associates, [and] to a university for which [the plaintiff] works," because the plaintiffs failed to plead specifically the university involved or where the individuals resided, the bare allegations could not assist in proving personal jurisdiction over the defendants). Dr. Coomer, however, states only that (1) he saw information about the film in Colorado; (2) he watched the livestream from the opening night while he was in Colorado; and (3) he viewed the film in Colorado after its release. (ECF No. 89-1, pp.11, 19.) He pleads no facts regarding how many other people in Colorado saw information about the film, let alone how many viewed it in Colorado. Without more, the court cannot conclude that the Defendants' national publication of their film created more than random and fortuitous contacts with Colorado. Similarly, although he asserts that the Defendants profited from sales of the film in Colorado, he offers no specific information to support that contention.

Third and finally, Dr. Coomer states a number of facts suggesting that the Defendants had other contacts with Colorado. Specifically, he contends that, after the film was released, Mr. Byrne and Mr. Lucescu, as agents of TAP, appeared on Mr. Oltmann's podcast to solicit financial contributions to their cause. (ECF No. 89-1, p.19.) He further notes that TAP spent a substantial amount of money, $100,000, in support of a candidate for Colorado Secretary of State in the 2022 election. (Id., p.14.) He states that the PAC then ran ads in the Republican primary that year. (Id.) Dr. Coomer makes no argument, however, that the events at issue in *this* case arose

13

out of those efforts to fundraise and those political donations to support a Colorado candidate. Thus, those facts do not support a claim of specific jurisdiction—the Court "must ask whether an individual defendant's suit-related conduct connects her to the forum 'in a meaningful way.'" *Weller v. Flynn*, 312 F.Supp.3d 706, 717 (N.D. Ill. 2018) (quoting *Walden*, 571 U.S. at 290). While potentially relevant to the question of whether the Court has general jurisdiction over a defendant, in this case the Court cannot conclude that Dr. Coomer has alleged contacts that are so continuous and systematic as to essentially render Colorado a home state to the Defendants. *See XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020).

Having reviewed Dr. Coomer's pleadings and affidavits, resolving all factual disputes in his favor, the Court concludes that it lacks personal jurisdiction over the Defendants in this case. The Court also concludes, however, that this case should not be dismissed. Rather, it should be transferred to the Middle District of Florida for further proceedings pursuant to 28 U.S.C. § 1631.

"A court may sua sponte cure jurisdictional and venue defects by transferring a suit under the federal transfer statutes, 28 U.S.C. §§ 1406(a) and 1631, when it is in the interests of justice." *Trujillo v. Williams*, 465 F.3d 1210, 1222 (10th Cir. 2006). The 10th Circuit has "directed that, after the enactment of § 1631, where the court determines that it lacks jurisdiction and the interests of justice require transfer rather than dismissal, '[t]he correct course . . . [is] to transfer the action pursuant to [§ 1631].'" *Id.* at 1223 (quoting *Ross v. Outward Bound School, Inc.*, 822 F.2d 1524,1527 (10th Cir. 1987). The statute provides that:

> Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court *shall*, *if it is in the interest of justice*, *transfer* such action or appeal to any other such court (or, for cases within the jurisdiction of the United States Tax Court, to that court) in which the action or appeal could have been brought at the

14

> time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631 (emphasis added).  Having determined that this Court lacks jurisdiction, it must now determine whether the interests of justice require the case to be transferred, and whether there is another court in which this action could have been brought at the time it was filed.

The Court concludes that this action could have been filed originally in the Middle District of Florida.  Both Mr. Byrne's residence and TAP's headquarters are located in the Middle District of Florida.  (ECF Nos. 1, 7, 9, 11, 13.)  Mr. Byrne's address is in Sarasota, Florida and TAP also lists its principal address as one in Sarasota in its filings with the Florida Department of State.[2]  In fact, in its Renewed Motion to Dismiss, TAP specifically requests in the alternative that, should the Court decline to dismiss this case, that it transfer the matter to the Middle District of Florida.  (ECF No. 87, p.7.)  In addition, the Defendants concede that film production activities took place in Florida.  (ECF Nos. 85-1 (Declaration of Steve Lucescu); 92, p.1.)

Turning, then, to the question of whether transfer is in the interests of justice, the Court concludes that it is.

> Factors considered in deciding whether a transfer is in the interest of justice include whether the claims would be time barred if filed anew in the proper forum, whether the claims alleged are likely to have merit, and whether the claims were filed in good faith or if . . . it was clear at the time of filing that the court lacked the requisite jurisdiction.

*In re Cline*, 531 F.3d 1249, 1251 (10th Cir. 2008).  Here, the Court concludes that at least some portion of the claims likely have merit—similar claims have repeatedly survived motions to

---

[2] Record with Florida Department of State Division of Corporations, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=AMERICAPROJECT%20N220000033150&aggregateId=domnp-n22000003315-9409940e-cc29-4edc-80b9-62730738d1aa&searchTerm=The%20America%20Project&listNameOrder=AMERICAPROJECT%20F070000062610.

15

dismiss filed in the related cases cited by Dr. Coomer. *See, e.g. Coomer v. Make Your Life Epic LLC*, 659 F. Supp. 3d 1189, 1207 (D. Colo. 2023) (denying defendants' Special Motion to Dismiss Pursuant to Colorado Revised Statutes § 13-20-1101); *Coomer v. Lindell*, No. 22-CV-01129-NYW-SKC, 2023 WL 2528624, at *13 (D. Colo. Mar. 15, 2023) (denying Defendant's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted); *Coomer v. Donald J. Trump for President, Inc.*, No. 2020CV3431 (District Court for City & County of Denver, Oct. 25, 2022) (order denying defendants' Motions to Dismiss).

Similarly, the Court cannot conclude that Dr. Coomer filed this action in bad faith—the injuries he has suffered as a result of the statements made by the Defendants and others that impugn his character and professional reputation are wide-ranging and severe. Dr. Coomer reports that he has received, and continues to receive, death threats as well as other sorts of harassment from individuals upset by what they believe was his role in the 2020 presidential election. He also notes that he is no longer able to continue to work in his chosen field on election matters, which has impacted him financially and certainly emotionally. He states that he believes the impacts of these events will stay with him for the rest of his life. And the Defendants do not deny that they leveled these accusations at Dr. Coomer, that they pointed at him as at least one source of what some people in this country, notwithstanding the absence of facts, accept a massive injustice.

The Court concludes that the question of jurisdiction in this case was not obvious. In fact, it is the subject of this lengthy Order. Finally, were this Court to simply dismiss this case, Dr. Coomer would face the potential bar of the statute of limitations, preventing him from litigating the merits of his claims. "The phrase 'if it is in the interest of justice' relates to claims which are nonfrivolous and as such should be decided on the merits." *Galloway Farms, Inc. v.*

*United States*, 834 F.2d 998, 1000 (Fed. Cir. 1987).  Because this Court lacks jurisdiction to decide the merits of this case, it will not resolve Defendants' remaining arguments for dismissal but will instead leave that matter to the Middle District of Florida.

**IV.    Conclusion**

Based on the foregoing the Court ORDERS as follows.

(1)    That the Defendants' Renewed Motions to Dismiss (ECF Nos. 84, 87, 88) are **DENIED**;

(2)    That the Clerk is directed to **TRANSFER** this action to the Middle District of Florida; and

(3)    That the Clerk is directed to **CLOSE** this matter.

DATED this 8th day of January, 2024.

BY THE COURT:

_____
RAYMOND P. MOORE
Senior United States District Judge